Good morning, Your Honor. Mel Washburn on behalf of Mr. Fernandez Unzueta. I'm going to reserve two minutes for rebuttal. With the Court's permission, there are two issues, two essential issues before the Court. Whether the agency misapplied the law when it found that the petitioner's claim for withholding of removal was barred by the particularly serious crime provision, and whether the agency misapplied the law when it found that the government had overcome the presumption that the petitioner has well-founded fear of future persecution or risk of future persecution if returned to Mexico. Are those severable? In other words, if we were to hold that substantial evidence does support the changing country conditions, and I know you don't concede that. I'm just trying to figure out if these are independent. If we were to conclude that there is substantial evidence on that point, would we have to reach the particularly serious crime question at all? No. Okay. So they're independent in that sense. Well, let me – yes, right. If you start with the trial judge's assessment of the record and you find that – Well, let me ask you the question. You have an asylum claim and a withholding claim. Right. Is – are the particular serious crime issue relevant only to the withholding claim or relevant to the asylum claim only? It's relevant to the withholding and the asylum claim. Okay. It's not relevant to the cat – to the – Right. Right. No, cat's claim is separate, I understand. So the issue is not independent of both of your claims. Right. Correct. On the particularly serious crime issue, what do you want us to do? I want you essentially to adopt the reasoning of Judge Reinhart's – But let's assume that we agreed with Judge Reinhart. There's a bunch of crimes here. It's a concurring – it's a concurring opinion. But let's assume that there's a bunch of crimes here. Your client, what, arrested 22 times, gets eight months – eight years in jail for one of the DUIs, keeps driving while on a suspended license. You're not suggesting we should find as a matter of law that none of these crimes is particularly serious, are you? No, Your Honor. What I'm suggesting you should find is that you have – there has to be one crime that's particularly serious. Okay. I understand your position. What you cannot do is aggregate crimes and say, considering all three or four or 20 of these DUIs. No, I understand your position because Judge Reinhart laid it out in his concurring opinion. My question is, do we remand? The majority opinion, too, which you might be inclined to follow even if you recognize that mine was correct, and the majority sent this back to the BIA to resolve this question, as I recall. Yes, Your Honor. And said that the BIA should be the one to determine what a particularly serious crime means. I – maybe you're – Well, Your Honor, I – Just wait. Just wait. I'm sorry. Maybe your opponent can tell us whether the BIA has yet. I can tell you that. Oh, you can. Yes. Has it answered the question? Okay. The BIA in the Delgado case considered the issue and adopted your position. It's an unpublished opinion. Unpublished. It's an unpublished opinion. But they said that it has to be one crime. And do we have the citation of that unpublished opinion? Your Honor, I'm sorry. I don't have it in front of me. I'll send it to you. Okay. Well, but my question remains. Let's assume that this remains an open question. It sure looks to me like at least one of these crimes is particularly serious, but that's not my job in the first instance. And so even if you're right, shouldn't we remand to the BIA and say, tell us what your – you know, is it your position that none of the crimes individually is particularly serious? Here's my position. I mean, what relief do you want with respect to this issue? Right. And as to – I want a remand on withholding that – with an instruction to grant withholding, because there's a presumption which is never – well, we'll come to that. But on the particularly serious crime bar. Yes, yes. On the particularly serious crime bar, the immigration judge in Delgado has remanded to him because it was not clear at all what the agency's decision was, whether they were looking at one crime or many crimes. And that's been resolved by the – and that was why it was remanded, because this Court could not tell what the basis was. I can tell in this case that the agency said we think the aggregation of crimes makes it sufficiently serious. My question is, given the fact that if I were an immigration judge, I would find about six of these crimes particularly serious, what relief should we give with respect to your contention? Are you asking us to say, well, they blew it and, therefore, they can't find a particularly serious crime? Or are you asking us to send it back and tell them, as Judge Reinhart said in this concurring opinion, you can't aggregate them, tell us whether there's any one of them that's particularly serious? Your Honor, I want the former. He – that judge, that immigration judge had Delgado – had Judge Reinhart's opinion in front of him. He distinguished it on the grounds that my guy had a lot more crimes than Delgado  Well, let's assume he was wrong. That was his distinction. Well, that's clearly wrong. The judge blew it. The judge applied the wrong standard. So we say, well, you applied the wrong standard, you only get one chance, we're never going to send it back to you to apply the right standard? This is – this is a category in which you should not get two kicks. This is – this is a – he looked at those crimes. If one of those crimes was particularly serious, he could have said so. Do we have the authority to say, all right, he was wrong on aggregating them, and, therefore, even though there may be several particularly serious crimes in – within that aggregated group, that we're not going to give him an opportunity to consider that under the right standard? He considered the record. He considered the record in its entirety. He never said, one of these might be a particularly serious crime, but I'm going to take a bunch of them. He never said that. Counsel, before you run out of time, I'd appreciate going back to the question that I had initially, which is having – not to do with particularly serious crime, but on changed conditions. There certainly has been a change. The question in my mind is, is it enough of a change to rebut the presumption of future persecution? And on that – on that point, where the evidence is on both sides of the question, what is – how do we deal with our standard of review? Because there is certainly evidence of considerable change on a continuum, but maybe it's not enough. How do we know? Here's my analysis on that one. The cases clearly say that there has to be an individualized consideration of the particular circumstances of this guy. This guy is a native of Ciudad Juarez. It's the only city in Mexico that he's ever lived in. There's no evidence, and the agency doesn't begin to suggest that when he goes back to Mexico, he's going to go to Mexico City. They say he's going to go back to Ciudad Juarez. Ciudad Juarez is one of the most, as we know, violent, corrupt cities in Mexico. That's where he's going to go. And what the – what the BIA finds is that in Mexico City, conditions are starting to change. What the BIA finds is that the Federal Government has passed a law that says the people shouldn't be discriminated against. Wait a minute. That's not entirely what they found. For example, I'm just picking – because we're in this dialogue. There's one paragraph saying there's evidence showing that most murders, at least of transsexuals, occurred in the 1990s, and since then many substantive changes have occurred. There are gay rights parades not just in Mexico City, but also Guadalajara, Monterrey. Mexican newspapers and periodicals generally are more supportive, and so on. So it isn't entirely the discussion limited to Mexico City or any particular part. They're trying to assess, it seems to me, whether rightly or wrongly, the situation as a whole in Mexico. So I guess I'm still struggling with our standard of review. They discuss cultural changes, they discuss legal changes, and so on and so forth. Okay, here's what they never discuss. They never discuss how any of those changes are going to affect the life that my client is actually going to lead if he's returned to Mexico. That's what they never discuss. Well, I'm not sure I can totally agree with that, because one of the things they then say after this whole conversation that I've been describing is they said, well, we're also taking into account that he has made, I forget the number, eight or nine return trips to the city from which he came, and he's not suffered any of these things. So that's, it seems to me, fair to call that part of their individualized analysis. I mean, I read this as a whole to say there have been a lot of changes. There have been legal changes, there have been cultural, social changes. And when we apply it to this guy, he has made a number of trips recently where he has not suffered problems. And so they're assessing it with respect to him. Your Honor, I'm going to suggest that you go back and read the discussion of those return trips. What you'll find is that those return trips were all made in the 1980s and 1990s. He never went back after 1995. What you'll also find, and this is one of the most bizarre parts of the BIA's opinion, you will find that it was during some of those early trips that some of the most horrific persecution occurred. And you can find it in the record, you can find it in the statement of facts in our brief. And they rely on those trips as evidence that he will not be persecuted. In all of those trips, and I'll point this out, if you look at the cases where return trips, and we talk about this in our brief, if you look at the cases where return trips are used as evidence of changing conditions, those are trips where the petitioner goes back and stays for a year or two. Now, please. The trips. Let me. I want to ask a specific question here regarding Administrative Record, page 148, where they say that your client traveled to Ciudad, I'm sorry, my pronunciation is terrible, once or twice a year for nine years after the alleged abuse. And these particular trips, he did not claim any form of discrimination, and most recently he went with gay friends to a beach resort. Now, is it your position that those, that is not supported by the record? Absolutely. That he went for, after the alleged abuse? Absolutely. That is absolutely not supported by the record. So he did not make those trips? He made the trips. And on some of those trips he was abused, violently. No, but. Shockingly. I understand, I understand your argument. I'm asking Judge Graber's question. Judge Graber's question says that the BIA, that the record appears to indicate that after that abuse, he continued to make trips to Mexico in which he was not abused. Is that a fair statement of the record? Right. And my answer to that one is, those trips are distinguishable. And if you look at the cases, and for instance, we discussed these in our record, in our brief, a case called Calabong and a case called Pruce. Those are cases where the individual went back for brief periods of time under very discreet circumstances where he stayed out of the public and made all kinds of efforts not to be seen and not to encounter the people who had abused him. In those circumstances, yes, those people were abused during their return trips. And in each case the Court found, and those are Ninth Circuit cases, in each case the Court found those return trips are not evidence of a fundamental change in cultural conditions. I mean, the standard for the government is extremely higher, fundamental change in country conditions. And an occasional trip, very brief period, and our Mr. Fernandez had the same, took sort of the same set of precautions, always stayed with family and friends, did not go out in public, took all sorts of precautions, and stopped going back. He never went back after 1995, except for one time in 2007 when he took a, when he went to a beach resort. Now, two things he's not going to do if he goes back to see that Juarez. He's not going to stay out of the public and always travel with family and friends, and he's not going to live at a beach resort. None of those. You don't have to talk that fast. We're listening. I'm sorry. None of, none of, sorry, I'm exercised. I'll slow down. Pardon me. But to me, the BIA's analysis here is just shockingly callous in the way in which they an uneducated, unskilled laborer who spent his entire life in Ciudad Juarez. The judge himself acknowledges that my client seems to know nothing about Mexico outside of Ciudad Juarez. And nothing in that record, nothing in that record begins to tell that court anything about the conditions in places like Ciudad Juarez. Guadalajara. Guadalajara is a place where Americans retire. Monterrey, same thing. Mexico City is the capital of the city and the only cosmopolitan area in the country. What do you mean? Those facts simply are not relevant to Ciudad Juarez. Now, the government could have done better. May I interrupt you for a second just to ask a question? Is Ciudad Juarez the relevant locale to analyze? Yes, it is. Normally, when we look at asylum cases, we look at whether or not there are other places in the country of citizenship where somebody might not be persecuted. Is that a relevant analysis here? It's an analysis that was never made. The government never begins to suggest that he could relocate within Mexico. That's a separate. There are basically two ways they can get around likelihood of persecution. Either country conditions have changed or he can relocate within the country. They never suggest. They never even touch the issue of relocation and with good reason. There's no evidence that this guy could ever live anywhere other than Ciudad Juarez. That's where he has family. That's, you know, that's, I mean, he's, the man's an illiterate alcoholic. We'll give you a little time for a rebuttal. Okay. Thank you, Your Honor. See if you can whip up some enthusiasm next time. Good morning, Your Honors. I'm Erica Miles for Attorney General Holder. Can I, before you begin. Sure. A new thing came up today. Is it now a BIA position that the crime, the particularly serious crime, must be an individual one rather than an aggregation of non-particularly serious crimes? The BIA has not spoken in a precedent decision on this issue. Right, but it has spoken in a non-precedential decision. We have the BIA speaking in different, making different determinations. So we don't have the board speaking as a whole as governing precedent as of yet. What's the position of the United States of America on that issue? We don't. The position is that the board should announce its position in a precedent decision so everyone has an understanding of how it interprets the term particularly serious crime. We do have the statute. At the least, you would like us to remand so that the board could make a precedent decision. If the board deems it's necessary. As this Court has recognized, we also have so many crimes in this case that on remand, because it goes to fundamental eligibility for asylum and withholding of removal. So if the board on remand still has to address the question of fundamental eligibility to even apply, they could look at one crime on remand. That's my question, or at least it's my next question. If on remand the board were to find that one of these crimes were particularly serious, that would end the analysis on both asylum and withholding, would it not? It would. But if this Court need not ask the board to do that because there are alternate findings in this case that dispense with every application to prevent Mr. Fernandez's concern with removal. No, I understand your position, but I'm just asking procedurally. If we were to say to the board, boy, it looks like one of these is probably particularly serious, but we don't make that finding in the first instance. Right. We send it back to you, and you can either tell us, no, you're sticking to the aggregation or you found one particularly serious. And then if they do find one particularly serious, the case ends, assuming that they're correct. Except for the convention against torture. Except for the CAT claim. Yes. Okay. I wanted to make sure I understood that procedurally. Yes. And here, to, you know, piggyback on that point of the case coming to an end, the immigration judge committed no abuse of discretion in denying asylum, and opposing counsel, Mr. Fernandez and Zueta, truly have waived review of that finding altogether. And they're, even if the court were to examine that decision, it would, it should find that there was no abuse of discretion, so asylum. I'm not sure I fully understood your waiver argument. Sure. Would you explain it? The waiver argument is that in their opening brief, first of all, they didn't even acknowledge that there is an independent finding that even if he were to qualify, if he's not barred by the particularly serious crime, even if, even if it undertook a full merits analysis as a matter of discretion, the agency, both the immigration judge and board, have denied asylum. Asylum, as opposed to withholding a review. You're looking at administrative record number 149, item B-3, discretionary analysis. Yes. Where he's, they're relying on the very lengthy series of offenses and unwillingness to be rehabilitated, blatant disregard for the laws and the safety of others, et cetera. So you're saying that's an independent ground for denial of asylum. Yes. Okay. Denying as a matter of discretion. It's not, it's a requirement under the statute. It's a requirement under this Court's case law. Denying asylum, as opposed to withholding a removal, is a discretionary form of relief. Withholding a removal is mandatory if you're eligible to apply and if you meet all of the meritorious factors. I would like to ask you about changed country conditions also. Yes. Because I guess I would like to know where our standard of review comes into play, because although country conditions have indeed changed, they're not perfect if you track through all the documentation. So there are still problems. And how do we know where on the continuum substantial evidence falls? I mean, how do we know? This Court's review does remain the same as sort of in a general merits, if you were looking at it with the burden of proof on the applicant. Here it's a shifted burden of proof on the government. But it still is the question you have to answer is, does the evidence in the record compel the conclusion that the changes in Mexico, and also personal changes, are not so significant such that he's still eligible for asylum? Well, personal changes. He's still a gay man, I assume. Sure. And so his personal circumstances haven't changed. And the opinion of the agency doesn't really rely on changed personal circumstances. No. But the opinion of the agency does rely on the circumstances overall. And that is the question here. It's not changed country conditions. It's changed circumstances. And the immigration judge and board do cite that there is a lengthy passage of time here, the last incident was 1986. We also have his return trips up to 2007. Let me ask you specifically about those. So there seems to be a challenge, at least as I understand it, to the specific description of the return trips as having followed in time after the persecution that he experienced when he was living in Mexico, because there is a finding of past persecution. Yes, there is. And so is the board's factual description supported by the record that these return trips, up to 18 of them, happened after he left, after the persecution had occurred? Yes, it does. He, for a period of about 10 years after the 1986 incident, he went back to visit his grandmother. His testimony is for about 10 years following his persecution and decision not to return, he still returned once to twice a year for about 10 years to visit his grandmother with family. And then on top of that, the incident that actually got him caught at the border was him going to Mexico to a resort with friends, and then coming back is where immigration questioned him and brought him into proceedings. Did he also testify that he, leaving aside that last trip you mentioned, did he also testify that he didn't go out during the daytime and avoided any contact with the public when he was on these trips? I don't think he specifically said that. I think what he said was he was accompanied by his family members. They would typically visit his grandmother and stay at the grandmother's house, and they would be outside for events such as backyard barbecues and things like that. It would be a day trip typically, so I don't believe there was an overnight. But like I said, he did it once to twice a year for about 10 years, those trips, and then he had the resort trip. So he stayed with his family, did things with them, and didn't go out and come into contact with the general public? Right. I think they went – I think he said they just went straight to the grandmother's house. Let me ask you about the changing country conditions. I have a State Department report, which I think is timely, but unfortunately I don't have the year. But the BIA relied on the language, the law prohibits several types of discrimination, including bias based on sexuality. That's in the BIA report. The next paragraph says that while homosexuals experienced a growing social acceptance, the National Center to Prevent and Control states that discrimination persisted. Homophobic beliefs were common, reflected principally in this. Reports of attacks against homosexuals and transsexuals were frequent. That's the next part after the sentence you quoted. Then the UN report in 2006 says Mexico remains a hostile and potentially dangerous place for those who are public about their sexual orientation, especially effeminate men and transvestite prostitutes. Now, this is an effeminate man. Then – I'll skip – I won't read it all, but it's a very interesting – it goes on to say effeminate behavior assists at far greater levels of social disapproval than does homosexuality per se. Openly gay or effeminate individuals face daunting challenges, including violence. Effeminacy is systematically repressed throughout society. This is all from the record. The Washington Post article in 2008 says the passage of recent anti-discrimination laws has provoked aggressions by some in the society, and especially some police. Now, all that's in the record. I think the government carried its burden of showing that changed country conditions, as applies to this effeminate man, should result in reversing the fear of persecution, carrying the burden of overcoming that. Yes, here, because the burden is changed circumstances overall. So that's one. So circumstances in Mexico, as well as the passage of time, as well as his return trips reflect his own attitude, has changed to go back to Mexico and that he's willing to step it up, so to speak, by going and staying overnight at a resort with friends, for example. That is a factor for the changed circumstances to rebut whether or not it's objectively reasonable still that he has a fear of persecution. Two – And it's your burden.  It is the government's burden. But secondarily, and this is a very important point, is that the persecution that he fears, forward-looking, has to involve the same basis and the same persecutor. The persecutor he talked about – and we're talking about asylum and withholding here – the government has to either be involved or unable and unwilling to control. And he talked about the police harming him in 1982 and in 1986. There was a finding of past persecution based on those encounters. However, all of the reports in the record, and nothing cited by opposing counsel, have a reflection that the government is continuing in that type of conduct. In fact, there's a – the evidence shows that the government attitude has changed. Yes. You mentioned the police. And the last thing I want to do is it has provoked aggressions. Passage of these laws has provoked aggressions by some of society, especially some police. Typically – that could be some individuals acting out, but the overall environment in Mexico has showed an enormous shift with the passage of laws, the permission in many cities of civil unions and a wide radio campaign by President Fox in 2005 to get society as a whole, as well as all of government agencies, to be tolerant. We have ample evidence in the record that show that if somebody has harmed or experienced discrimination, they do go and report it to the police now, which is a big change from the 80s. People said they were afraid. Now they do report it, and the police and government agencies investigate. They issue reports about the improvement of the treatment of gay people in Mexico, and it is – there's an enormous shift in the government agency's attitude and actions toward the homosexual population in Mexico. And that's why it's key here, because you can't look at society as a whole. The U.N. report says Mexico remains a hostile and potentially dangerous place for those who are public about the sexual orientation, especially effeminate men. But that's talking about perhaps the city and crime and violence, like gang cases, for example. But we don't find that the government is doing the persecution or unwilling and unable to try and help curb it. If it continues, it means the government is unable to control it. But hostility – another point here is hostility and discrimination do not necessarily amount to persecution. And here we have to look at is it objectively reasonable still, based on his claim from 1982 and 1986, is it still – does he still have that qualification here that the country conditions are such that he has a well-founded – but here it's not well-founded. Now, is it that he more likely than not asylums off the table? It's withholding of removal. Is it still more likely than not that he will be persecuted if he goes back? Okay. Thank you, counsel. Time's up. Thank you. Thank you, Your Honor. Now that I've had a deep breath, I'd like to make just a couple of – Deep breath. Two minutes. A couple of sane legal points. First and most importantly, on the change country conditions, we have to remember there's a presumption here in favor of the applicant. The I.J. found that he was credible. The I.J. found that he had been persecuted in the past. The I.J. found that he was entitled to a presumption. The situation in which we're here today is the government must overcome that presumption by a preponderance of the evidence. Now, the simple fact is that all the evidence the government cites is evidence that we put in the record. They didn't go to any trouble at all to put any evidence into the record. And, Your Honor, you quite properly and apparently without a great deal of difficulty found that in the evidence that we've provided, there are many, many, many citations and discussions which show that things haven't changed at all. They haven't been burdened by a preponderance of the evidence to overcome that presumption, one. Two, they have to do it individualized. There's the cases, numerous cases say the analysis must be individualized to the  But that has absolutely never occurred here for the reasons that I already discussed. They haven't come close to overcoming that presumption. The presumption is in favor of my client. And at least as to withholding, that should end the matter. For asylum, there's a discretionary analysis. And here's the thing on this discretionary analysis. The discretionary analysis, and you can read the judge's opinion, is a balancing. He balances on the one hand favorable factors, which he finds many, and then he balances unfavorable factors, and the unfavorable factors are my client's criminal record. He considers the whole record there. But on this side, the favorable side, one of the things he considers is the likelihood of persecution. And because, as we've discussed at length today, the judge's view and analysis and conclusions relating to the likelihood of persecution are skewed so far from any reasonable analysis, his discretionary analysis is way out of balance. Because he says, well, here, this man's a drunk, and he drives drunk many times. And believe me, I'm not apologizing for that. But if he goes back to Mexico, well, nothing's going to happen to him because the government's making efforts to change the environment. And, Your Honor, you made a very good point. The government, all the government talks about is all the efforts that the government, the Mexican government, has made to change these conditions. The President makes speeches. They pass laws. There are referenda. There are gay pride parades in Mexico. Those are all efforts to change the conditions, which all the rest of the evidence shows have never changed. Very far from the immediate preponderance that they're supposed to meet. Thank you, counsel. Your time is up. The case is adjourned. It will be submitted.
judges: Reinhardt, Graber, Hurwitz